[Crim. No. 5144. In Bank. Oct. 24, 1950.]

THE PEOPLE, Respondent, v. JOHN P. STECCONE et al., Appellants.

J. Emmet Chapman, Frederick C. Dewar, Golden & Fratis, J. Bruce Fratis and Julius M. Keller for Appellants.

Fred N. Howser, Attorney General, and Clarence A. Linn, Deputy Attorney General, for Respondent.

SPENCE, J.—Defendants John P. Steccone and Peter Makris were charged with conspiracy (Pen. Code, § 182, subd. 1) to "keep and maintain rooms and places . . . [at] 1313 Park Street and 136 Santa Clara Avenue in the city of Alameda, with books, papers, devices and paraphernalia for the purpose of recording and registering bets and wagers on horse races." (Pen. Code, § 337a, subd. 2.) Six overt acts were listed in the information. The jury returned a verdict finding each defendant guilty as charged. Motions for new trial were separately made and denied. Defendants were placed upon probation, conditioned, among other things, upon defendant Steccone serving a term of six months and defendant Makris a term of three months in the county jail. Each defendant has appealed from the "judgment" and from the "order denying a new trial."

Since the court did not pronounce judgment but suspended proceedings and granted probation, the purported appeals from the judgments must be dismissed (*People* v.

*Murphy,* 60 Cal.App.2d 762, 765 [141 P.2d 755]; *People* v. *Warnick,* 86 Cal.App.2d 900, 901 [195 P.2d 552]; *People* v. *Labarbera,* 89 Cal.App.2d 639, 644 [201 P.2d 584]), and consideration will be given only to the points raised by appellants as ground for reversal of the orders denying a new trial. Each appellant questions the sufficiency of the evidence to sustain the verdicts and the admissibility of certain evidence against him; and, in addition, appellant Steccone attacks the propriety of the trial court's refusal of specific instructions requested by him. A review of the record compels the conclusion that neither appellant has shown any ground for reversal.

From the record it appears that appellant Makris, the owner and operator of the Step-Inn Club, a restaurant and tavern located at 1313 Park Street, Alameda, was accepting in July, 1947, bets placed on horse races. Police Officer White testified that "pursuant to his plain-clothes duty, investigating bookmaking," he went to Makris' club on July 15, 16, and 18, 1947, on each of which days he "placed a $2.00 bet"; that during the course of his visits there, Makris made two similar telephone calls from behind the counter—one on the 15th and the other on the 16th—the first to an unnamed person and the second to a person identified as "John," each time "call[ing] off a lengthy list of numbers . . . [and] various amounts of money," using, among other phrases, the words "to win, to place, to show"; that while he was on the premises he saw certain persons at the bar place bets with Makris, with the latter putting the money so received "in his pocket"; and that he, White, collected on his first bet with Makris, who "checked the list" and then paid him his winnings. Makris was not arrested at this time.

The next date pertinent to the charge against appellants is February 3, 1949, some 18 months following Officer White's investigation. Police Inspector Johnson testified that on that day about 11 o'clock in the morning, he with three other police officers "in civilian clothes" went to the Step-Inn Club, asked the "customers in the place . . . to leave," and then searched the premises "for evidence." In a drawer in the back of the bar they found approximately 45 sheets of paper, ruled horizontally and vertically into lines and columns by a mimeographing process, but with no writing thereon. Makris was then arrested. While the officers were still there, appellant Steccone entered the club, and was immediately "placed in custody" and searched. On his person was found

a "Daily Bulletin and Sports Review" of February 3, 1949, some sheets of ruled paper and a "single sheet" with writing on it, having columns of figures and the name "Pete" at the top. These articles were "laid on [a] shuffleboard table," and as the officers "turned away," Steccone "grabbed" the paper marked with the name "Pete" and "tore [it] up." One of the officers "picked up the pieces," "grabbed ahold of . . . Steccone and told him that was a very foolish thing to do," and Steccone replied "yes, he guessed it was." These "pieces" were later "put . . . together with Scotch tape" and constitute one of the exhibits in the record.

After the arrest of appellants at the Step-Inn Club, the officers went to Steccone's home at 136 Santa Clara Avenue, Alameda, and were admitted by Mrs. Steccone. Upon searching the rumpus room in the basement, they found an adding machine containing a tape with a long series of figures on it, the figures corresponding to those found on the sheet of paper torn up by Steccone at the time of his arrest in the club. The officers also found in a closet in the same room of the Steccone home a small "open cardboard box" with "one single sheet" in it ruled in a manner similar, but not identical with the sheaf of papers found in the Step-Inn Club, and likewise without any writing thereon. A police officer, following his qualification as an expert witness on methods used by bookmakers in the vicinity for keeping their records, stated that the various mentioned items found in the two places were paraphernalia commonly used in the conduct of bookmaking.

In addition to the foregoing evidence, there was admitted as to appellant Makris only a statement which he made to Officer Johnson in the office of the Inspector of Police in Alameda on February 3, 1949, after his arrest—and so identified by Officer Johnson and the police department secretary at the trial. It appears that Makris there stated that the "run down" sheets—"ruled off in squares"—found at his club had been given to him by "Johnnie Steccone" for registering bets on the horse races, that he made "sometimes 10 . . . 15 . . . 20 bets" with "Johnnie per day," involving "as a rule" sums of money from $20.00 . . . [to] $50.00," that they settled their accounts every day "about 10:30 or 11:00 o'clock" when Johnnie would come to the club, and that it was Johnnie's practice to "mark . . . down" these bets on one of these ruled sheets.

As a general rule, a conspiracy can only be estab-

lished by circumstantial evidence "for, as the courts have said, it is not often that the direct fact of an unlawful design which is the essence of a conspiracy can be proved otherwise than by the establishment of independent facts, bearing more or less closely or remotely upon the common design (5 Cal. Jur. 521); and it is not necessary to show that the parties met and actually agreed to undertake the performance of the unlawful acts (citing authority), nor that they had previously arranged a detailed plan . . . for the execution of the conspiracy (citing authority)." (*People* v. *Sampsell,* 104 Cal. App. 431, 438-439 [286 P. 434].) ■ However, before evidence of the acts and declarations of an alleged coconspirator is admissible against the other, the fact of the conspiracy must be proved. (Code Civ. Proc., § 1870, subd. 6.) In recognizing the application of this rule of evidence in a criminal case, it was said in *People* v. *Talbott,* 65 Cal.App.2d 654, at page 663 [151 P.2d 317] : ". . . the fact of the conspiracy must be proved before the evidence of said acts or declarations may be considered. The issue, however, need be proved only to the extent of establishing prima facie evidence of the fact. It need not be established by a preponderance of the evidence in a civil action nor beyond a reasonable doubt in a criminal action; the latter doctrine applies only to the issue of guilt. Any evidence received by virtue of this rule necessarily is received conditionally, for in the final analysis, the jury must first pass judgment on the question as to whether the asserted conspiracy has been proved." (See, also, *People* v. *Marvin,* 48 Cal.App.2d 180, 197 [119 P.2d 413] ; *People* v. *Correa,* 44 Cal.App. 634, 641-642 [186 P. 1055] ; and any language in *People* v. *Doble,* 203 Cal. 510, 517 [265 P. 184], which might be said to indicate the requirement of a greater amount of proof must be disapproved.)

In determining here whether there was sufficient circumstantial evidence to make the required prima facie showing, these items should be considered : Evidence showing that appellants Steccone and Makris each maintained bookmaking establishments "with books, papers, devices and paraphernalia for the purpose of recording and registering bets upon horse races"; that "Pete" Makris "laid off" his bets by telephone with a man named "John"; that John Steccone was a "lay off" man—a bookmaker's bookmaker; that Steccone was arrested in the Step-Inn Club which Makris used for his bookmaking activities; that when arrested and searched, Steccone had in his possession a register of bets which bore the heading

"Pete"—a contraction of Makris' given name Peter—and which Steccone attempted to destroy; that the figures on the adding machine tape found in Steccone's home corresponded to those on the register of bets taken from Steccone at the time of his arrest in Makris' club; and the presence in Makris' club of blank forms for the registering of bets similar to those found in Steccone's home. So significant in this recital of the record are these incriminating factors: the similar documentary evidence found in the two places as indicating that the "two establishments had been in communication" (*People* v. *Labarbera, supra,* 89 Cal.App.2d 639, 641), the telephone call made by appellant Peter Makris to "John" for the purpose of placing his day's bets, indicating the conduct of operations between them upon the "lay-off" plan (*People* v. *Oreck,* 74 Cal.App.2d 215, 218-221 [168 P.2d 186]), and appellant John Steccone's consciousness of guilt in attempting to destroy the register of bets found in his possession at the time of his arrest in Makris' club and bearing the identification of "Pete" in its heading. Such facts taken in combination as a chain of connecting circumstances pointing to a collaboration between appellants in their bookmaking operations appear sufficient to make out a prima facie case of conspiracy against them. (*People* v. *Correa, supra,* 44 Cal.App. 634, 641-642.)

Appellants argue that the names "Pete" and "John" are common names, and that the fact of the telephone call made by Makris to the "lay off" man "John" coupled with the fact of Steccone's possession of the register of bets with the word "Pete" on the top some eighteen months later when he was arrested in Makris' club, would not warrant an inference that appellants *Peter* Makris and *John* Steccone were the persons involved as collaborators in the maintenance of a bookmaking business. But if "Pete" did not mean Makris and "John" did not mean Steccone, then appellants could and should have denied it. These were facts within their knowledge and power to dispute, but they failed to testify. So it was said in like circumstances in *People* v. *Adamson,* 27 Cal. 2d 478, at pages 490-491 [165 P.2d 3]: ". . . if it appears from the evidence that defendant could reasonably be expected to explain or deny evidence presented against him, the jury may consider his failure to do so as tending to indicate the truth of such evidence and as indicating that among the inferences that may reasonably be drawn therefrom, those unfavorable to the defendant are the more probable." (See, also, *People* v. *Liss,* 35 Cal.2d 570, 576 [219 P.2d 789].)

Although standing alone as bits of isolated evidence, the names "Pete" and "John" as used in reference to the alleged activities of appellants, might be entitled to but little weight, their evidentiary value as a connecting link along with other incriminating factors must be recognized. Application of this principle was made in *People* v. *Trujillo*, 32 Cal.2d 105 [194 P.2d 681], where a hammer marked on its handle with the initials "E.W." was found at the scene of the crime and was held to have been properly admitted in evidence as an incriminating, connecting circumstance—"another link in the chain of evidence"—against the defendant "Ernest Woodmansee," though the latter denied ownership of it. (P. 111.) Of course, as appellants strongly assert, "conspiracies cannot be established by suspicion" (*People* v. *Long*, 7 Cal.App. 27, 33 [93 P. 387]), nor can a defendant's failure to testify as to facts within his knowledge be "used to supply a failure of proof by the prosecution" (*People* v. *Zoffel*, 35 Cal.App.2d 215, 221 [95 P.2d 160]), but such is not the case here, as the record discloses numerous corroborative facts evidencing appellants' collaboration in bookmaking activities at their respective establishments. The significance of such names in the chain of proof against appellants was for the jury's determination. (*People* v. *Trujillo, supra,* 32 Cal. 2d 105, 111.)

 Since the evidence above set forth was sufficient to make out a prima facie case of conspiracy against appellants, the trial court did not err in admitting against both appellants evidence of the acts and declarations of the alleged coconspirators in furtherance of the conspiracy (*People* v. *Talbott, supra,* 65 Cal.App.2d 654, 663) ; and when the last-mentioned testimony is considered in connection with the prima facie case, and without regard to the admissions made by appellant Makris after his arrest, there appears to have been ample evidence to sustain the finding of the jury that both appellants were guilty of the crime charged. Of course, with respect to appellant Makris there was the added factor of his abovementioned admissions made to the arresting officers.

██ Nor is there merit in appellant Steccone's contention that the court erred in refusing certain instructions offered by him. The requested instructions were either covered in substance by the instructions given or failed to state correctly the proposition of law involved, and as so classified, no purpose would be served in discussing them separately as listed by appellant. Rather, in summary, it need only be said that

an examination of the entire charge reveals that the trial court fully, fairly, and clearly instructed the jury upon all legal principles pertaining to the alleged conspiracy.

The purported appeals from the alleged judgments are dismissed. ■ The orders denying appellants' motion for a new trial are affirmed.

Gibson, C. J., Shenk, J., Edmonds, J., Traynor, J., and Schauer, J., concurred.

Carter, J., concurred in the judgment.