[Crim. No. 5396. Second Dist., Div. Three. July 27, 1955.]

THE PEOPLE, Respondent, v. WILLIAM M. MAXEY et al., Defendants; CHARLES E. MAXEY, Appellant.

Welford R. Wilson for Appellant.

Edmund G. Brown, Attorney General, and Jay L. Shavelson, Deputy Attorney General, for Respondent.

VALLÉE, J.—Appellant Charles E. Maxey, his brother William M. Maxey, and Clarence Luther Anderson were charged in count I of an indictment with conspiracy to commit grand and petty theft. (Pen. Code, § 182, subd. 1.) Seventeen overt acts were alleged. Appellant was also charged in counts II, IV, VII, and IX with separate offenses of grand theft (Pen. Code, § 487, subd. 1), and in counts III, V, VI, VIII, and X with separate offenses of falsifying and failure to make proper entries in corporate records. (Corp. Code, § 3020, subds. (a), (b).)[1] William M. Maxey was also charged with several counts of grand theft. Appellant was found guilty as charged in counts I to X inclusive. A separate verdict was returned as to each count. William M. Maxey was found guilty as charged in count I and in a number of the other counts. Anderson pleaded guilty to count I. Proceedings were suspended and appellant was granted probation. An order granting probation is deemed to be a final judgment. (Pen. Code, § 1237.) Charles E. Maxey appeals from the judgment and the order denying his motion for a new trial. His principal contention is that the evidence does not support the verdicts.

Loyal Automobile Insurance Company was a California corporation doing business in the county of Los Angeles, insuring against loss, damage, and theft of automobiles. Anderson testified that in January, 1951, the Maxeys informed

---

[1] Corporations Code, section 3020, reads: "(a) Every director, officer, or agent of any corporation, domestic or foreign, who knowingly receives or possesses himself of any property of the corporation, otherwise than in payment of a just demand, and, with intent to defraud, omits to make, or to cause or direct to be made, a full and true entry thereof in the books or accounts of the corporation, is guilty of a public offense.

"(b) Every director, officer, agent, or shareholder of any corporation, domestic or foreign, who, with intent to defraud, destroys, alters, mutilates, or falsifies any of the books, papers, writings, or securities belonging to the corporation, or makes or concurs in making any false entries, or omits or concurs in omitting to make any material entry in any book of accounts or other record or document kept by the corporation is guilty of a public offense.

"(c) Each public offense specified in this section is punishable by imprisonment in a state prison not less than three nor more than 10 years, or by imprisonment in a county jail not exceeding one year, and a fine not exceeding five hundred dollars ($500), or by both such fine and imprisonment."

him they had purchased an insurance company and wanted him to join the organization; they employed him in February, 1951, although he had no knowledge of or experience in the insurance business; he was to be trained by William. He later testified the employment was in 1952. An office was set up for him in Santa Monica and he was given the work of handling claims for Loyal. In September, 1951, the Jackson family of Detroit, at the solicitation of the Maxeys, purchased a controlling interest in Loyal for about $60,000. Appellant was then elected president and William, secretary. The Maxeys had a small financial interest in the company. The Jacksons remained in Detroit and left the management and control of the company largely in the hands of the Maxeys.

On October 15, 1951, articles of incorporation of Pan-Cosmos Insurance Agency were filed with the secretary of state. William became president; appellant, secretary; and one William Freeman, treasurer, of Pan-Cosmos. On November 13, 1951, the Maxeys and Freeman opened an account in the name of Pan-Cosmos with Bank of America. The office of Pan-Cosmos consisted of a desk and filing cabinets in the room occupied by Loyal. On November 26, 1951, one Price was employed as business manager of Pan-Cosmos. He had little experience in the insurance business and was under the supervision of appellant.

In September, 1952, the Maxeys and Anderson purchased Ed Thomas' garage, later renamed "Swede's Auto Repair," each to contribute $2,000 to capital. Appellant stated to the others that he could raise the $2,000 but he did not want his name to appear because of his relationship with Loyal and he would substitute the name of his wife. A bank account was opened in the name "Swede's Auto Repair" on September 12, 1952. Any two of William, Anderson, and one Thomas were authorized to draw on the account. Appellant's wife did not contribute any money to the purchase of the garage or to the capital account which was credited to her.

*Count I, Overt Acts 1, 2, 3, 4, and 5.*
*Counts II and III.*

Count I alleged as overt acts 1, 2, 3, 4, and 5 the formation of Pan-Cosmos, the execution of an agency agreement between Loyal and Pan-Cosmos, the theft of $3,500 from Loyal by appellant and William, the drawing of a check on Pan-Cosmos' bank account by appellant and its deposit in his personal

account, and the drawing of a check for $2,395.75 by appellant on his personal account and its deposit in an escrow transaction. Count II alleged the theft of the $3,500. Count III alleged falsification by appellant and William of Loyal's records with respect to the $3,500 check.

In December, 1951, an agreement was executed by Loyal and Pan-Cosmos by which the latter was to become a general agent for Loyal. The agreement was signed by appellant and William on behalf of Loyal and by Price on behalf of Pan-Cosmos. It provided that Pan-Cosmos, as agent, could retain as commissions 10 per cent of premiums collected for Loyal. It also provided for profit-sharing based on the excess of premiums over subsequent claims on policies procured by Pan-Cosmos. On January 10, 1952, appellant, as president, and William, as secretary of Loyal, signed a check on Loyal's bank account for $3,500 payable to Pan-Cosmos. At appellant's direction, Loyal's accountant entered this check on Loyal's records as a contingent commission on a ''retro'' contract. The check was deposited in Pan-Cosmos' bank account the same day. At the time of the deposit the balance in the account was $86.05. Immediately following the deposit, two checks were drawn on the Pan-Cosmos account by appellant and William as officers of Pan-Cosmos, one for $3,000 and one for $500. The $3,000 check was payable to Security-First National Bank and was on the same day— January 10, 1952—deposited in appellant's account therein. The $500 check was payable to William and was cashed by him. Prior to the deposit of the $3,000 check, the balance in appellant's account was $68.52. Immediately following the deposit appellant drew a check for $2,395.75 on his account. This check was deposited in an escrow as part payment on a home being purchased by appellant and his wife. Appellant told Loyal's accountant that Pan-Cosmos had produced some $35,000 in insurance and the $3,500 represented a 10 per cent commission. The fact was that the insurance had been written by another agency which placed the insurance with Loyal directly and paid the premiums less commissions directly to Loyal. Pan-Cosmos never remitted any premiums to Loyal.

*Count I, Overt Act 6. Counts IV and V.*

Count I alleged as overt act 6 the theft of $1,000 by appellant from Loyal. Count IV alleged the same theft. Count V alleged that appellant omitted to make and cause to be made a full and true entry with respect to the $1,000 in the records of Loyal.

Tilford Gaines was insured by Loyal against theft of his Chevrolet between May, 1951, and May, 1952. In January, 1952, his car was stolen. He reported the theft to Loyal and received a check for $1,445. In April, 1952, the car was found by the police and title was vested in Loyal pursuant to the terms of the contract of insurance. Appellant informed one Smead that the Chevrolet was for sale and Smead so informed Pete Perry, who offered $1,000 for the car. Perry made a down payment of $100 by a check payable to appellant and paid the $900 balance by a cashier's check payable to Loyal. The $100 check was endorsed by appellant and given to "LaTijera Golf, Inc." No entry was made in the Gaines claim file showing receipt of the $100 or the $900, which should have been applied to reduce Loyal's $1,445 loss on the claim. There was nothing in the records of Loyal to show that $1,000 had been received for the car. Appellant told Loyal's accountant that the $900 had been received by Pan-Cosmos as the result of a sale by the latter of "a car that it owned" and instructed him to credit against the $3,500 owed by Pan-Cosmos to Loyal, which he did.

### Count I, Overt Act 7. Count VI.

Count I alleged as overt act 7 the theft of $85 by appellant and William from Loyal. Count VI alleged that appellant and William falsified the books of Loyal by drawing a check for $85 payable to James Construction Company and entering it on the records of Loyal as payment for painting and shelving when Loyal was not indebted to James.

On March 24, 1952, a check for $85 was drawn on Loyal's account by appellant and William payable to James Construction Company. At appellant's direction, the amount was entered on Loyal's disbursement journal as payment for work done on its office building. The $85 check was used by appellant as payment on work performed by James at appellant's home. Appellant told Loyal's bookkeeper the $85 was an advance payment to James for painting and shelving in Loyal's office and that he would get them to do the work if "he could ever catch up with them." No such work was ever done at Loyal by James.

### Count I, Overt Acts 8, 9, and 10.
### Counts VII and VIII.

Count I alleged as overt acts 8, 9, and 10 the filing of an adjustor's report and loss expense voucher for $44.90 by Anderson, the theft of $642.52 by appellant and William, and

the theft of $44.90 by Anderson. Count VII alleged the theft of the $642.52 by appellant and William. Count VIII alleged that appellant and William falsely entered the $642.52 in the records of Loyal as payment for repairs on an automobile pursuant to a claim by an assured.

There was a claims file in Loyal's records compiled in connection with a purported accident involving a 1948 Chrysler owned by one Franklin who was insured by Loyal from August 22, 1951, to February 22, 1952. The file contained copies of the policy, a report of loss showing an accident on August 14, 1952, purportedly signed by the assured, an adjustor's report by Anderson showing the results of a supposed investigation made by him, a statement of expenses of $44.90 supposedly incurred by him, estimates of cost of repair, final billing of the insurance company, and a draft dated September 15, 1952, for $642.52 on Loyal signed by appellant and William payable to Swede's Auto Repair. The draft was endorsed by Anderson for Swede's Auto Repair and deposited in the latter's bank account. As previously mentioned, the account had been opened on September 12, 1952. The check for $642.52 was entered in the cash disbursement journal of Loyal as payment on the Franklin claim. A check for $44.90 was given to Anderson by Loyal and entered in the books as payment of expenses incurred in adjusting the Franklin claim. The estimate of repairs in the file had in fact been made on another car. The assured, Franklin, did not have an accident on August 14, 1952, or at any time during the period his Chrysler was insured by Loyal, nor did he make any report of loss. He did not sign the report of loss purportedly signed by him, nor authorize anyone to sign on his behalf.

*Count I, Overt Acts 11, 12, and 13.*
*Counts IX and X.*

Count I alleged as overt acts 11, 12 and 13 the filing of an adjustor's report and loss expense voucher for $75.90 by Anderson, the theft of $745.98 by appellant and William, and the theft of $75.90 by Anderson. Count IX alleged the theft of the $745.98 from Loyal by appellant and William. Count X alleged that appellant and William falsely entered the $745.98 in the records of Loyal as payment for repairs on an automobile pursuant to a claim by an assured.

There was a claims file in the records of Loyal relating to a claim purportedy made by one Christians, who was insured by Loyal for damage to his 1947 Ford. The file contained a report of loss reportedly signed by the assured and a loss re-

port by Anderson, a statement including $25.90 purportedly incurred as expense by Anderson as adjustor and $50 purportedly advanced by him for "tow and storage," a check dated September 19, 1952, for $745.98 payable to Vic Perry's Auto Repair signed by appellant and William, and estimates of cost of repairs on a 1947 Ford. The $745.98 check was entered in the disbursement records of Loyal as a payment for repairs on Christians' 1947 Ford. A Loyal check signed by appellant and William for $25.90 was given to Anderson. It was entered on Loyal's records as compensation for settlement of the Christians claim. Another check for $50 signed by appellant and William was given Anderson by Loyal and entered in the disbursement journal as repayment for advances. The estimate of repairs purportedly made by Vic Perry's Auto Repair on the Christians 1947 Ford was in fact an estimate on a 1949 Ford which had not been insured by Loyal. Christians did not have an accident during the period he was insured by Loyal. He did not report any accident nor did he sign or authorize anyone to sign the report which bore his purported signature.

One Smead, who was the owner of Vic Perry's Auto Repair, and with whom the Maxeys did business, had taken title to a totally wrecked 1949 Ford. William purchased the car from Smead for $300. Vic Perry's Auto Repair made an estimate of $745.98 as the cost of repairing this car. The estimate was altered so as to describe the 1947 Ford owned by Christians and placed in the Christians claim file. The check for $745.98 was used to pay the cost of repairing the 1949 Ford owned by William. The 1949 Ford was thereafter sold to Loyal for $1,000, which issued a check dated September 12, 1952, signed by appellant and William for that amount payable to Swede's Auto Repair. The check was endorsed by Anderson on behalf of Swede's Auto Repair and deposited in its account.

*Count I, Overt Acts 14, 15, 16, and 17.*
*Counts XI and XII.*

Count I alleged as overt acts 14, 15, 16, and 17 the filing of an expense voucher for $25 by Anderson, the theft of $800 by Anderson and William, the theft of $25 by Anderson, and the writing of a letter by William to an attorney. Count XI was a charge against William and Anderson, and not against appellant. Count XII was a charge against William, and not against appellant. Since overt acts 14, 15, 16, and 17 did not allege any activity on the part of appellant it is unneces-

sary to relate the evidence with respect thereto. It is enough to say the evidence fully supports the doing of the acts alleged.

Without further discussion it is apparent that the evidence and the reasonable inferences which the jury may have drawn therefrom amply support the verdicts. (See *People* v. *Bentley*, 75 Cal. 407, 409 [17 P. 436]; *People* v. *Steccone*, 36 Cal. 2d 234, 237-238 [223 P.2d 17]; *People* v. *Curtis*, 106 Cal.App. 2d 321, 325 [235 P.2d 51]; *People* v. *Fratianno*, 132 Cal. App.2d 610, 623-625 [282 P.2d 1002].) Appellant's argument goes to the credibility of the witnesses and the weight of the evidence—matters with which this court has no concern.

In his opening brief, in stating his points, appellant says the court erred in admitting and rejecting evidence as to four matters. He does not mention these points again in either his opening or closing brief. Notwithstanding the failure of appellant to argue the points or furnish us with authority with respect to them, the attorney general, with commendable regard for his responsibility, discusses them at length. We have examined the points and find them all to be without merit.

We find no error in the record.

The judgment and the order denying a new trial are affirmed.

Shinn, P. J., and Wood (Parker), J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied August 25, 1955.